

SO ORDERED.

Robert J. Faris
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF HAWAII

| | |
|---|---|
| In re:<br><br>ANTONIO BATACAN SIMON and MARIETTA ALCON SIMON,<br><br>Debtors. | Case No. 11-02788<br>Chapter 7 (closed) |
| ANTONIO BATACAN SIMON and MARIETTA ALCON SIMON,<br><br>Plaintiffs,<br><br>vs.<br><br>BANK OF AMERICA, N.A.;<br>RICHARD J. HOEHN,<br><br>Defendants. | Adv. Pro. No. 21-90003<br><br>Dkt. 98 |

1

## MEMORANDUM OF DECISION ON MOTION FOR SUMMARY JUDGMENT

In this wrongful foreclosure case, defendant Bank of America, N.A. ("BANA"), seeks summary judgment on two grounds. First, BANA contends it is not liable for the allegedly wrongful foreclosure because it had sold the loan to another party before the foreclosure. Second, BANA argues that plaintiffs have offered no evidence that they suffered any compensable damages.

The court held a hearing on the motion on January 13, 2023. Lisa Swartzfager and Patricia McHenry represented BANA and James Bickerton and Van-Alan Shima represented the plaintiffs.

I will grant the motion in part and deny it in part.

## I.     STATEMENT OF FACTS

The following facts are undisputed (except as otherwise indicated).

In 2003, Antonio Batacan Simon and Marietta Alcon Simon bought a property in Lahaina, Hawai'i. They paid for the property with a cash down payment and the proceeds of a mortgage loan.

In December 2004, the Mr. and Mrs. Simon refinanced their property, borrowing a total of $510,000 from National City Mortgage Co. d/b/a Accubanc Mortgage ("Accubanc"). The loan was evidenced by two promissory notes in favor of Accubanc in the amounts of $410,000 and $100,000, secured by first and second mortgages on the property. I will refer to the $410,000 loan as the "First Mortgage Loan."

Most of the refinance proceeds went to repay the Simons' existing mortgage loan, but they also received $81,475.16 in cash which they used to renovate the property. Between 2006 and 2008, they spent at least $500,000 more to renovate the property.

Through a series of name charges and mergers, PNC Bank, National Association ("PNC") succeeded to the rights and obligations of Accubanc. For simplicity's sake, I will generally refer to both PNC and its predecessors in interest as "PNC."

PNC serviced the first mortgage at all relevant times.

On September 1, 2003, BANA and PNC executed a Master Seller's Warranties and Servicing Agreement ("Master Agreement"). Briefly

3

summarized, the Master Agreement provided that BANA could from purchase groups of mortgage loans; that PNC would make certain representations and warranties to BANA about each such group of loans; and that PNC would service the loans. Pursuant to the Master Agreement, in February 2005, BANA purchased a group of mortgages which included the First Mortgage Loan. After the transfer, PNC continued to service the First Mortgage Loan on behalf of BANA.[1]

In June 2009, the Simons began missing payments on the First Mortgage Loan. PNC communicated with the Simons about their defaults. In November of that year, PNC (through attorneys at Routh Crabtree Olsen) executed a forbearance agreement with the Simons. The forbearance agreement said that PNC was acting as servicer for BANA. The agreement also identified Routh Crabtree Olsen ("RCO") as "Lender's Counsel."

---

[1] The Master Agreement provided in Section 4.01: "[PNC], as an independent contractor, shall service and administer the Mortgage Loans and shall have full power and authority, acting alone, to do any and all things in connection with such servicing and administration which [PNC] may deem necessary or desirable, consistent with the terms of this Agreement and with Accepted Servicing Practices."

4

In early 2010, BANA conducted an internal review and identified shortcomings in the underwriting of the First Mortgage Loan. BANA decided that these shortcomings were breaches of the representations and warranties that PNC made under the Master Agreement. BANA demanded that PNC repurchase the loan; PNC agreed with BANA and repurchased the loan. PNC became the owner of the First Mortgage Loan on April 1, 2010.

No one told the Simons that PNC had repurchased the First Mortgage Loan from BANA.

PNC eventually directed attorneys at Routh Crabtree Olsen ("RCO") to initiate foreclosure proceedings. Even though PNC had repurchased the First Mortgage Loan, the foreclosure proceeded under BANA's name.

During this period, PNC continued to service other loans for BANA, and BANA separately authorized RCO to foreclose other loans on its behalf.

The foreclosure auction occurred (after a postponement) on October 7, 2010. Richard Hoehn submitted the highest bid in the amount of

U.S. Bankruptcy Court - Hawaii   #21-90003   Dkt # 115   Filed  02/11/23   Page 5 of 26

$499,900.00. The limited warranty deed conveying the property to Mr. Hoehn described BANA as the Grantor.

After the foreclosure sale, the Simons continued to believe that BANA owned the First Mortgage Loan, and BANA's own communications to the Simons were consistent with their view. On January 19, 2011, the Simons wrote to RCO challenging the foreclosure and demanding certain information. The Simons wrote that the foreclosing creditor was BANA and that PNC was the servicer. (ECF 100-21 at 1.) In its response, a BANA representative in the "Office of the CEO and President" said that the First Mortgage Loan was held by a trust of which BANA was trustee, that PNC was the servicer, and that the Simons should contact the servicer, PNC. (ECF 100-24.)

The value of the property at the date of the foreclosure is a disputed issue of fact. BANA offers evidence that at the time of the foreclosure, the fair market value of the property was $550,000. The Simons offer a retroactive appraisal stating that the fair market value was at least $782,000.

U.S. Bankruptcy Court - Hawaii   #21-90003   Dkt # 115   Filed  02/11/23   Page 6 of 26

Neither party has offered any evidence of the what the fair value of the property would have been in a properly conducted foreclosure sale.

At the time of the foreclosure, the amount outstanding on the First Mortgage Loan was $433,673.37. The Simons did not receive the sale proceeds in excess of the First Mortgage Loan (about $65,000) and there is no evidence showing what happened to that money.

## II.    PROCEDURAL HISTORY

The Simons filed a chapter 7 bankruptcy petition on October 21, 2011 (Bankruptcy Case No. 11-02788). Richard Yanagi was appointed as trustee. Mr. Yanagi filed a report that there were no assets available for distribution to creditors. On January 21, 2012, the court issued the Simons' discharge and closed the bankruptcy case.

The Simons did not list a possible wrongful foreclosure claim in their bankruptcy schedules. Therefore, the unscheduled claims remained part of the estate after the case closed.[2]

---

[2] *See* 11 U.S.C. § 554(d).

U.S. Bankruptcy Court - Hawaii   #21-90003   Dkt # 115   Filed  02/11/23   Page 7 of 26

On October 10, 2019, the Simons filed a motion to reopen their case to administer the wrongful foreclosure claim. The court granted the motion, reopened the case, and reappointed Mr. Yanagi to serve as trustee and administer the newly disclosed assets

On February 1, 2021, Trustee Yanagi filed the complaint that commenced this adversary proceeding.[3] In summary, the complaint alleges that BANA conducted the foreclosure in an improper manner that damaged the Simons, entitling the bankruptcy estate to recover damages.

Trustee Yanagi later determined that the claims in this case have little value to the estate. He therefore moved in the main bankruptcy case to abandon the claims. The court approved the abandonment on June 30, 2022. This transferred the claims to the Simons and the court granted the trustee's motion to substitute the Simons as plaintiffs in the place of the trustee.

---

[3] I have ruled on the timeliness of the claims in another decision (ECF 23). I have also dismissed all claims against Richard Hoehn, the successful bidder at the foreclosure auction (ECF 34).

8

## III.   SUBJECT MATTER JURISDICTION

The court directed the parties to be prepared to discuss whether the bankruptcy court retained subject matter jurisdiction after the trustee abandoned the claims to the Simons.

Counsel for the Simons have correctly argued that subject matter jurisdiction is assessed as of the filing of the complaint.[4] When the trustee commenced this adversary proceeding, there is no question that the proceeding was "related to" the Simons' bankruptcy case within the meaning of 28 U.S.C. § 1334. A proceeding is "related to" a case under the Bankruptcy Code if "the outcome of the proceeding could conceivably have any effect on the estate being administered in bankruptcy . . . . An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankruptcy estate."[5] The Ninth Circuit has

_____

[4] *1250 Oceanside, LLC v. Buckles (In re 1250 Oceanside Partners)*, 260 F.Supp.3d 1300, 1310-1311 (D. Haw. 2017).
[5] *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984).

9

recognized "[a] bankruptcy court's 'related to' jurisdiction is very broad, including nearly every matter directly or indirectly related to the bankruptcy."[6]

Because a recovery of the property or money damages would have brought assets into the estate for the benefit of creditors, the adversary proceeding was "related to" the bankruptcy case at the inception, and the bankruptcy court continued to have subject matter jurisdiction even after the ownership of the claims and plaintiffs changed.

Another line of cases holds that, after the termination of a bankruptcy case, the bankruptcy court may retain jurisdiction of related proceedings, after considering "economy, convenience, fairness, and comity.'"[7]

Retention of this adversary proceeding is justified under the *Carraher* factors. Considering that this case has been pending in federal court for some time and is set for a jury trial in a few months, it would be more

---

[6] *In re Wilshire Courtyard*, 729 F.3d 1279, 1287 (9th Cir. 2013) (quoting *Sasson v. Sokoloff (In re Sasson)*, 424 F.3d 864, 868 (9th Cir. 2005)).

[7] *Carraher v. Morgan Electronics, Inc. (In re Carraher)*, 971 F.2d 327 (9th Cir. 1992).

U.S. Bankruptcy Court - Hawaii   #21-90003   Dkt # 115   Filed 02/11/23   Page 10 of 26

economical, convenient, and fair to retain the case in federal court. Because there is no parallel proceeding in state court, comity does not play a significant role.

## IV.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[8] In considering a motion for summary judgment, the court must "draw all reasonable inferences from the evidence" in favor of the nonmovant.[9] The movant bears the initial responsibility of presenting the basis for its motion and identifying those portion of the record . . . that it believes demonstrate the absence of a genuine issue of material fact.[10] If the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and to show (1) the fact in contention is

---

[8] Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).
[9] *O'Connor v. Boeing N. Am., Inc.*, 311 F.3d 1139, 1150 (9th Cir. 2002).
[10] *Celotex*, 477 U.S. at 323.

U.S. Bankruptcy Court - Hawaii   #21-90003   Dkt # 115   Filed  02/11/23   Page 11 of 26

material, i.e., a fact "that might affect the outcome of the suit under the governing law," and (2) that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. [11]

## V.    ELEMENTS OF THE SIMONS' CLAIMS

In order to establish a wrongful foreclosure claim, plaintiffs must demonstrate: "(1) a legal duty owed to the mortgagor by the foreclosing party; (2) a breach of that duty; (3) a causal connection between the breach of that duty and the injury sustained; and (4) damages."[12]

To establish a UDAP claim, plaintiffs must demonstrate: "(1) either that the defendant violated the UDAP statute (or that its actions are deemed to violate the UDAP statute by another statute), (2) that the consumer was injured as a result of the violation, and (3) the amount of damages sustained as a result of the UDAP violation."[13]

---

[11] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-250 (1986).
[12] *Lima v. Deutsche Bank National Trust Co.*, 494 P.3d 1190, 1197 (Haw. 2021) (*citing Bank of America, N.A. v. Reyes-Toledo*, 428 P.3d 761, 776 n.12 (2018)).
[13] *Id.* (*citing Kawakami v. Kahala Hotel Investors, LLC*, 421 P.3d 1277, 1289 (Haw. 2018)).

12

In its motion for summary judgment, BANA contends that the

Simons cannot prove that BANA owed them a legal duty or violated the

UDAP statute because BANA did not own the loan when it was foreclosed.

BANA also contends that the Simons have offered no evidence that they

have suffered compensatory damages.

## VI.   AGENCY

BANA argues that because it had sold the First Mortgage Loan before

the foreclosure occurred, it is not liable for any actions taken by the holder

of the loan (PNC) or the foreclosing agent (RCO). The Simons contend that

PNC or RCO were acting as agents of BANA, so BANA is liable for their

conduct.

Under familiar legal rules, a principal is liable for the acts of its agent

done in the course and scope of the agency relationship.[14]

"An agency relationship may be created through actual or apparent

authority. Actual authority exists "only if there has been a manifestation by

---

[14] *See, e.g.*, *State v. Hoshijo ex. rel. White*, 76 P.3d 550, 562-563 (Haw. 2003);
*Lopeti v. Alliance Bancorp*, Civ. No. 11-00200 ACK-RLP, 2011 WL 13233545,
at *15 (D. Haw. Nov. 4, 2011)

U.S. Bankruptcy Court - Hawaii   #21-90003   Dkt # 115   Filed  02/11/23   Page 13 of 26

the principal to the agent that the agent may act on his account and consent by the agent so to act, and may be created by express agreement or implied from the conduct of the parties or surrounding circumstances."[15]  There is no dispute that the Master Agreement expressly created an agency relationship between BANA and PNC.  There is also no dispute that BANA executed a limited power of attorney authorizing RCO to conduct nonjudicial foreclosures, making RCO BANA's agent with respect to these foreclosures.  Thus, at least for a time, both PNC and RCO had actual authority to enforce the First Mortgage Loan as BANA's agent.

There is no evidence in the record that BANA and PNC or RCO ever expressly agreed to terminate the agency relationship. It is reasonable to infer, however, that the actual authority of PNC and RCO to act as BANA's agent terminated when BANA transferred the First Mortgage Loan back to

---

[15] *Cho Mark Oriental Food, Ltd. v. K&K Intern.*, 836 P.2d 1057, 1061 (Haw. 1992) (cleaned up).

U.S. Bankruptcy Court - Hawaii   #21-90003   Dkt # 115   Filed  02/11/23   Page 14 of 26

PNC. When BANA divested itself of the First Mortgage Loan, the subject matter of and purpose for the agency relationship disappeared.[16]

But "[t]he termination of actual authority does not by itself end any apparent authority held by an agent."[17] Rather, "[a]pparent authority ends when it is no longer reasonable for the third party with whom an agent deals to believe that the agent continues to act with actual authority."[18] This rule, often called "lingering authority," "recognizes that it is reasonable for third parties to assume that an agent's actual authority is a continuing or ongoing condition, unless and until a third party has notice of circumstances that make it unreasonable so to assume." [19]

In this case, many circumstances indicated that PNC and RCO were still acting as BANA's agents when they foreclosed the First Mortgage

---

[16] *See* Restatement (Third) of Agency § 3.09 (2006) ("An agent's actual authority terminates . . . upon the occurrence of circumstances on the basis of which the agent should reasonably conclude that the principal no longer would assent to the agent's taking action on the principal's behalf.")

[17] Restatement (Third) of Agency § 3.11(1) (2006).

[18] *Id*. § 3.11(2) (2006).

[19]  Restatement (Third) of Agency § 3.11 cmt. c (2006); *See also Stout St. Funding LLC v. Johnson*, 873 F. Supp. 2d 632, 641 (E.D. Pa. 2012) (same).

15

Loan. PNC continued to act as BANA's servicer for many other loans, and RCO also foreclosed many loans for both PNC and BANA. All of the foreclosure documents, including the deed transferring the property at the conclusion of the foreclosure, were made in BANA's name. Perhaps most significantly, when the Simons wrote to BANA about the foreclosure, BANA told the Simons that it was trustee of the trust that held the First Mortgage Loan and that the Simons should address their concerns to PNC as servicer.

At a minimum, a genuine issue of material fact exists as to whether PNC or RCO had "lingering authority" as agents of BANA.[20]

## VII. DAMAGES

BANA also argues that the Simons cannot demonstrate that they suffered compensatory damages.

To survive summary judgment, the Simons must demonstrate that they suffered compensatory damages.[21] The central purpose of

---

[20] If the Simons had filed a cross-motion for summary judgment on this issue, I might well have granted it.

[21] *Lima*, 494 P.3d at 1199.

compensatory damages is to <u>restore the plaintiffs to their position prior to the tortious act</u>.[22]

In *Field v. Bank of America (In re Tirso)*, Adv. Pro. No. 20-90021, 2022 WL 567704 (Bankr. D. Haw. Feb. 23, 2022), *affirmed*, 642 B.R. 833 (D. Haw. 2022), I held that, where (i) the mortgagee's right to foreclose is unchallenged (because the mortgagee is admittedly in default of its obligations under the mortgage and the mortgage includes a power of sale), and (ii) the mortgagee's claim of wrongful foreclosure rests upon defects in the foreclosure process and not the fact that a foreclosure occurred at all, the mortgagee's compensatory damages are the difference between (a) the price actually obtained at the foreclosure saleand (b) the price that would have been obtained had the foreclosure been properly conducted. The district court affirmed this decision on appeal. *Id.* A further appeal to the Ninth Circuit is pending.

The Simons request that I revisit my holding in *Tirso*, arguing that my decision is inconsistent with the leading decisions of the Hawaii Supreme

---

[22] *Id.* at 1198 (emphasis added).

U.S. Bankruptcy Court - Hawaii  #21-90003  Dkt # 115  Filed  02/11/23  Page 17 of 26

Court. They contend that those decisions adopt an "out-of-pocket losses" measure of damages, and that their out-of-pocket losses include every penny that they spent to acquire, maintain, and improve the mortgaged property. I continue to disagree with the Simons' position. The measure of damages in *Tirso* places the mortgagor in the position it occupied before the wrongful foreclosure took place. The Simons' measure of damages would place them in the position they occupied before they even bought the mortgaged property. This measure of damages is incorrect because it is not tethered to the wrong.

The Simons rely heavily on *Santiago v. Tanaka,* 366 P.3d 612 (Haw. 2016), in which they claim that the Supreme Court approved the measure of damages for which they advocate. But the facts and holding of *Santiago* are very different from the present case.

The Santiagos agreed to purchase a tavern from Tanaka for $1,300,000 which consisted of an $800,000 down payment and a $500,000 seller-financed loan secured by a mortgage on the property. Before closing,

18

Tanaka failed to disclose material facts to the Santiagos about the sewer system that served the property.

The Santiagos sued Tanaka for nondisclosure. While the litigation was pending, Tanaka conducted a non-judicial foreclosure and bought the property for $365,000. The Santiagos added wrongful foreclosure claims to their lawsuit.

On appeal, the Supreme Court held that because Tanaka failed to disclose all material facts about the sewer system when she sold the property to the Santiagos, she was liable for breach of duty to disclose and negligent misrepresentation. The court also held that, because the Santiagos had cured their default under the mortgage before the foreclosure sale, the foreclosure sale was unlawful. This rendered the foreclosure sale invalid and voidable. But voiding the foreclosure sale was impractical because Tanaka had resold the property to a third party. Therefore, the court held that the Santiagos were "entitled to restitution of their proven out-of-pocket losses from Tanaka's wrongful foreclosure . . . and subsequent sale" of the property. *Id*. at 633. These damages consisted

19

of the Santiagos' down payment, all of their mortgage payments, closing costs, and property taxes. The court held that these damages included amounts awardable on the nondisclosure and negligent misrepresentation claims. This award put them in the position they occupied before they bought the property.

*Santiago* is distinguishable on at least two grounds.

First, Tanaka wronged the Santiagos twice: once, when she sold the property to them without making full disclosure; and again, when she foreclosed a mortgage that was not in default. In this circumstance, it was appropriate to give the Santiagos a monetary award that put them in the position they occupied before the first wrong, i.e., before they bought the property. In this case, BANA allegedly wronged the Simons only once: when it foreclosed the mortgage in an improper manner, at a time when the loan was in default and the Simons could not cure their default. In such a case, the remedy should put the Simons in the position they occupied before the wrong – when they owned a property that was subject to a

U.S. Bankruptcy Court - Hawaii   #21-90003   Dkt # 115   Filed  02/11/23   Page 20 of 26

defaulted mortgage that they could not cure – rather than the position they occupied before they even bought the mortgaged property.

Second, Tanaka was not entitled to foreclose at all: the Santiagos had cured their defaults, and indeed had made "virtually full payment," before Tanaka bought the property in the foreclosure sale.  In this case, however, the Simons do not deny that the mortgagee was entitled to foreclose. The alleged wrong lies, not in conducting a foreclosure that should never have happened, but rather in conducting a foreclosure in a wrong manner.

For these reasons, the Simons are not entitled to all of the items of loss for which the Santiagos could recover.

The Simons correctly point out that, in four subsequent wrongful foreclosure cases, the Supreme Court referred to *Santiago's* "out-of-pocket losses" standard. But none of these decisions holds that a plaintiff in the Simons' position is entitled to recover every item of damages which *Santiago* awarded.

In *Mount v. Apao*, 384 P.3d 1268 (Haw. 2016), a mortgagee conducted a nonjudicial foreclosure of property owned by a decedent's estate. The

U.S. Bankruptcy Court - Hawaii   #21-90003   Dkt # 115   Filed  02/11/23   Page 21 of 26

court held that the mortgagee in a nonjudicial foreclosure must comply with the Probate Code's deadline for presentation of claims against the estate. The court did not decide whether the mortgagee had complied with that requirement or what consequences would follow if the mortgagee had not complied. The court further held that the mortgagee had violated the nonjudicial foreclosure statute by failing to provide reinstatement figures to a former co-personal representative of the probate estate. As a result, the court held that the foreclosure sale was voidable, unless the current owner were an innocent purchaser for value. The court remanded the case to the trial court "to apply _Santiago_ to determine an appropriate remedy for the wrongful foreclosure." _Id_. at 1281. The bare citation to _Santiago_ does not convince me that the Supreme Court intended (in _Mount v. Apao_) to give plaintiffs such as the Simons all of the items of damage to which the Santiagos were entitled.

In _Hungate v. Law Office of David B. Rosen_, 391 P.3d 1 (Haw. 2017), the court held that the mortgagee had failed to properly conduct a nonjudicial foreclosure (because it gave less than four weeks' notice of the initial sale

22

date and failed to publish notices of postponements of the sale) and had

not proven that it satisfied its common-law duty to use fair and reasonable

means to obtain the best price under the circumstances. The court cited

*Santiago* for the proposition that, when voiding an improper foreclosure

sale is not possible, the mortgagor is entitled to restitution of proven out-

of-pocket losses. But the court said nothing about what items of loss should

be included.

In *Delapinia v. Nationstar Mortgage LLC*, 497 P.3d 106 (Haw. 2021), the

court held that a plaintiff in a wrongful foreclosure action need not plead

that the plaintiff can tender the amount of the debt secured by the

mortgage, and that a foreclosure that does not comply with the power of

sale is voidable, not void. The court vacated the judgment dismissing the

case and remanded the case to the trial court for further proceedings. The

court cited *Mount* and *Santiago* for the proposition that, if the property has

passed to an innocent purchaser for value, "an action at law for damages is

generally the appropriate remedy." *Id*. at 119-20. *Delapinia* says nothing

about the computation of damages.

U.S. Bankruptcy Court - Hawaii   #21-90003   Dkt # 115   Filed   02/11/23   Page 23 of 26

In *Lima v. Deutsche Bank Nat'l Tr. Co.*, 494 P.3d 1190, 1202 (Haw. 2021), the court held that, "[u]nder Hawai'i law, a borrower with no pre-foreclosure rights in property except as encumbered by a mortgage bears the burden of accounting for the effect of the mortgage in establishing the element of harm." The court noted that, in order to survive summary judgment, the plaintiff must provide evidence that it suffered compensatory damages, and that compensatory damages are intended to restore a plaintiff to the position they would have been in prior to the alleged tortious act."[23] The court held that this was consistent with *Santiago*: because the Santiagos had made virtually full payment of their mortgage debt, they did not need to deduct any mortgage debt from their damages. In short, the holding of *Lima* is consistent with *Tirso.*

Thus, I hold that the Simons are entitled to compensatory damages equal to the difference between the price paid at the foreclosure sale and

---

[23] *Id*. at 1199; *see also id*. at 1200 ("the general rule in measuring damages is to give a sum of money to the person wronged which as nearly as possible, will restore him [or her] to the position he [or she] would be in if the wrong had not been committed.") (cleaned up).

U.S. Bankruptcy Court - Hawaii   #21-90003   Dkt # 115   Filed  02/11/23   Page 24 of 26

the price that would have been paid at a properly conducted foreclosure sale, and that they are not entitled to recover everything they paid to purchase and maintain the property. But two items of damage survive summary judgment.

First, under *Hungate*, the foreclosing lender owed the Simons a duty to use fair and reasonable means to obtain the best price under the circumstances. There are genuine issues of material fact about whether the lender carried out this duty and, if the lender failed to do so, the price the property would have brought if the lender had done so.

Second, this case represents the rare situation in which the sales price was greater than the forgiven mortgage debt. The property sold for $499,900.00. At the time of foreclosure, the amount outstanding on the First Mortgage Loan was $433,673.37. The record does not account for the difference of about $65,000. The amount outstanding on the junior mortgage was $94,608.41; there is no evidence that any of the sales proceeds were paid to the holder of the second mortgage or that any of the second mortgage debt was forgiven.

For these reason, genuine issues of material fact preclude summary judgment on the damages issues.

## VIII. CONCLUSION

BANA's motion for summary judgment based on its sale of the First Mortgage Loan before the foreclosure is DENIED. BANA's motion based on plaintiffs' damages is GRANTED IN PART AND DENIED IN PART. The Simons may be entitled to damages in an amount equal to the price that the property would have brought in a properly conducted foreclosure sale (i.e., one that complies with all of the foreclosing lender's obligations, including but not limited to the duty to use fair and reasonable means to obtain the best price under the circumstances), minus the price realized at the foreclosure sale that occurred. They may also be entitled to a recovery if and to the extent that the sales proceeds were not properly applied. They are not entitled to recover the other items of damage that they claim. Finally, this decision does not determine whether the Simons are entitled to punitive damages (if they can prove compensatory damages.

**END OF MEMORANDUM OF DECISION**

26